**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CHARLES L. HILL, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>SECURITIES AND EXCHANGE COMMISSION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE<br><br>NO. ________________ |

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Plaintiff, Charles L. Hill, Jr. ("Mr. Hill" or "Plaintiff"), for his complaint against the Securities and Exchange Commission (the "SEC" or "Commission") respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.

Mr. Hill is an ordinary citizen unregistered with the Commission. He is not a broker. Nor is he an investment advisor. Yet he was still compelled three months ago to participate in an unconstitutional administrative proceeding brought by the SEC to prosecute alleged insider trading violations and impose stiff civil penalties. Instead of defending himself before an impartial arbiter in a federal

court providing fundamental procedural and constitutional safeguards, such as the right to a trial by jury and the right to conduct depositions and other discovery under the Federal Rules of Civil Procedure, Mr. Hill is forced to take part in a proceeding where the prosecutor, judge, and initial appeals court are all instruments in an SEC machinery that operates largely outside the judiciary's purview. Addressing the SEC's pursuit of remedies in administrative proceedings, one federal judge recently remarked that "[o]ne might wonder: from where does the constitutional warrant for such unchecked and unbalanced administrative power derive?"[1]

2.

The SEC alleges that Mr. Hill engaged in insider trading with respect to his trading in Radiant Systems Inc. ("Radiant") in June and July 2011 prior to its acquisition by NCR Corporation ("NCR"). The SEC advances a purely speculative theory that Mr. Hill must have had access to inside information based merely on the timing and concentration of his purchases of Radiant stock and his contacts with a close friend (the "Artist") who is also a close friend of the Chief Operating Officer of Radiant ("Radiant COO").

[1] *S.E.C. v. Citigroup Global Markets Inc.*, 34 F. Supp.3d 379, 381 (S.D.N.Y. 2014) (Rakoff, J.).

3.

Following the lead of several federal district courts recently holding, at the SEC's vehement insistence no less,[2] that they lacked subject matter jurisdiction to hear constitutional attacks of the Commission's use of enforcement actions in an administrative forum, Mr. Hill chose to assert his constitutional challenges within the agency proceeding itself. Relying on the SEC's procedural rules, Mr. Hill moved for summary disposition and dismissal of the proceeding based on his constitutional affirmative defenses. But on May 14, 2015, the presiding Administrative Law Judge ("ALJ") held that he (and the Commission itself) lacked the authority to resolve two core constitutional challenges attacking the very statute that authorized the SEC to bring the administrative proceeding and doubted that he had power to rule on a third challenge implicating the SEC ALJ removal structure.[3]

[2] In fact, the SEC has sought dismissal of an action in this judicial district that challenges the constitutionality of the administrative proceeding, vigorously arguing that the plaintiff's constitutional attack must be brought "through the Commission's administrative process." *See* Declaration of Stephen E. Hudson ("Hudson Decl.") ¶ 4, Ex. 1 at 11. This declaration is being filed concurrently herewith.

[3] *See* Hudson Decl. ¶ 5, Ex. 2 at 5, 9-10.

4.

Stripped of a forum that can decide these vital defenses, Mr. Hill now comes to this Court, less than one month before the final evidentiary hearing is to take place, to halt an administrative proceeding that is constitutionally infirm.

5.

Indeed, the proceeding is unconstitutional on several accounts:

- First, it is the product of a Congressional delegation of authority that lacks any intelligible principle to guide when the SEC is to bring a civil penalty enforcement action against an unregulated individual like Mr. Hill in an administrative forum, as opposed to a federal court.
- Second, the conferral of this authority is invalid because it abridges Mr. Hill's constitutional right to a jury trial.
- Third, the inferior officer overseeing that proceeding, the ALJ, is insulated from removal by two layers of good-cause tenure protection, thus impairing the President's ability to ensure that the laws are faithfully executed.

6.

Declaratory and injunctive relief is thus necessary to prevent the SEC from further subjecting Mr. Hill to an unconstitutional proceeding that he is otherwise

powerless to challenge in fundamental respects. At a minimum, crucial constitutional defenses raised by Mr. Hill in the administrative proceeding will go unheard. Indeed, the ALJ has already held that he "lack[s] the authority to rule on" Mr. Hill's delegation challenge and "lack[s] the authority to address" his challenge asserting a violation of the Seventh Amendment right to a jury trial.[4] *See* Hudson Decl. ¶ 5, Ex. 2 at 9-10. And though the ALJ addressed Mr. Hill's challenge to the ALJ removal structure, he did so only after expressing "doubt that [he had] the authority to address this issue," yet still assuming "that [he] ha[d] authority to do so." *See id.* at 5.

**<u>JURISDICTION, VENUE, AND PARTIES</u>**

7.

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1651, 2201 and 5 U.S.C. §§ 702 and 706. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

[4] In a separate administrative proceeding, an SEC ALJ remarked that he had "grave doubts whether [an equal protection] claim is justiciable in this forum" and held that he lacked the authority to address this claim. *See* Hudson Decl. ¶ 6, Ex. 3 at *72-73.

8.

Mr. Hill is a natural person, a citizen of the State of Georgia, and a resident of Fulton County. At all times relevant to this complaint, Mr. Hill has worked and resided in Georgia.

9.

The SEC is an agency of the United States government, headquartered in Washington, D.C.

10.

It is appropriate and necessary for this Court to exercise jurisdiction over Mr. Hill's claims because: (a) absent this Court's review at this stage, meaningful judicial review will be foreclosed; (b) Mr. Hill's claims are wholly collateral to the review provisions of the securities laws; and (c) Mr. Hill's claims fall outside the scope of the SEC's expertise. *See Free Enter. Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 489-90 (2010).

11.

Absent this Court's intervention, Mr. Hill's constitutional challenges will escape meaningful judicial review. A Court of Appeals cannot enjoin the Commission from instituting an administrative proceeding that has already run its course. And, even if a Court of Appeals later vacates an adverse final Commission

decision against Mr. Hill on constitutional grounds, it will be too late to unwind the harm that will have already befallen Mr. Hill in being compelled to participate in the very proceeding that he claimed from the beginning was unconstitutional. Were Mr. Hill thus compelled to await the conclusion of the administrative proceeding before seeking judicial intervention, his claims for injunctive and declaratory relief would be moot because the constitutional harm will have already occurred.

12.

The constitutional claims brought by Mr. Hill's invoke core federal questions over which a federal district court possesses original jurisdiction under 28 U.S.C. § 1331. These challenges have nothing to do with the merits of the allegations pending against Mr. Hill in the agency action. They are thus "wholly collateral" to the administrative proceeding.

13.

Mr. Hill's constitutional challenges also fall outside the domain of the SEC's expertise. These claims do not implicate the federal securities laws. Instead, they attack the existence and features of the administrative proceeding.

**BACKGROUND**

14.

Mr. Hill has been a resident of Atlanta, Georgia since 1959. Mr. Hill is a self-employed commercial real estate developer. Specifically, Mr. Hill purchases old fast food restaurant sites and then develops and leases them to single-tenant restaurants.

15.

Mr. Hill has an extensive understanding of the restaurant business, and in particular fast food restaurants. This knowledge and experience has been developed not only through years of interacting with his tenants through his work, but because several members of his family have owned and operated a number of restaurants, with his Father having been a Wendy's franchisee for over thirty five years. Thus, Mr. Hill became familiar with the business model for restaurants. Specifically, the notion that the two main factors in a restaurant that affect profitability are food and labor costs.

16.

Mr. Hill's prefers to make large investments in a company or product that he knows and understands. Mr. Hill further prefers to invest in companies where he knows or has confidence in the people that are behind the companies.

17.

Radiant was a point-of-sale technology company based in Alpharetta, Georgia. Mr. Hill had a solid understanding of Radiant's product and knew the people who ran Radiant.

18.

Mr. Hill was familiar with the officers of Radiant. For example, around 2004, Mr. Hill met Radiant System's Chief Executive Officer ("Radiant CEO"). Mr. Hill's daughter knew a young man who was friends with Radiant CEO's son. Mr. Hill would frequently pick up his daughter at Radiant CEO's home where they all gathered often. During these occasions, Mr. Hill would casually converse with Radiant CEO about the general nature of Radiant CEO's company. Mr. Hill also developed a favorable and positive impression of Radiant CEO as a person and a businessman. In addition, Mr. Hill knows Radiant's Chief Financial Officer ("Radiant CFO") and spent time with him in 2010 in connection with assisting him in locating potential restaurant sites. Mr. Hill also knows the Radiant COO. Around twenty years ago, he briefly assisted him in viewing potential sites for a real estate development idea that Radiant COO had and periodically bumps into Radiant COO around Atlanta.

19.

Mr. Hill became interested in Radiant because he believed that Radiant's point-of-sale machines and technology helped restaurants manage inventory control. Mr. Hill also noticed that many of his tenants used Radiant machines and had for several years. For example, every time one of Mr. Hill's tenants opens a new store, that tenant would use Radiant machines. Mr. Hill observed that Radiant machines were in many other places of business that he frequented, such as various gas stations and fast food restaurants that he regularly visited. Mr. Hill conducted his own market research by soliciting feedback on Radiant's machines from employees in many of these stores and always received a positive response.

20.

In addition to these observations, Mr. Hill began following Radiant's stock in the newspaper and watching Radiant's stock price for several years.

21.

In July 2001, Mr. Hill purchased around $10,000 of Radiant stock.

22.

Around mid-March 2011, the circumstances of Mr. Hill's commercial real estate business created an opportunity for Mr. Hill to heavily invest in Radiant. In February 2011, Mr. Hill sold a property for approximately $3.6 million. At the

time that Mr. Hill sold this property, he had around $2.5 million committed to two separate projects that he had contracts on. By or around May 12, 2011, both of the projects had unexpectedly been terminated by the tenant he had in mind for both projects. This left Mr. Hill with around $3.4 million cash sitting in the bank, after commission and debt, which was no longer committed to any commercial real estate project.

23.

At the end of May 2011, Mr. Hill opened a new account with Vanguard and SunTrust with the intent to buy Radiant stock. On June 1, 2011, Mr. Hill purchased 1500 shares of Radiant in each of his daughters' Custodial Accounts. On June 3, 2011, Mr. Hill purchased 50,000 shares of Radiant in the SunTrust Account for a little over a million dollars. On June 24, 2011, Mr. Hill purchased 13,000 shares of Radiant in the Vanguard Account.[5] Mr. Hill testified that he decided to purchase the additional shares because the price had gone down from his original basis. On July 1, 2011, Mr. Hill purchased 20,000 additional shares of Radiant in the Vanguard Account. On July 5, 2011, Mr. Hill purchased an additional 1,300 shares in each of the Custodial Accounts. On July 8, 2011, Mr.

[5] On June 24, 2011, Mr. Hill also purchased 20,000 shares of another company he had been watching since 2007 worth approximately $250,000.

Hill purchased 10,000 shares of Radiant for approximately $220,000 in the SunTrust Account.

24.

After the market closed on July 11, 2011, a merger agreement was announced between NCR and Radiant.

25.

Mr. Hill had no knowledge of NCR's acquisition of Radiant prior to the public announcement. Mr. Hill first became aware of NCR's acquisition of Radiant on July 12, 2011 when the stock broker from Wells Fargo assigned to the Custodial Accounts called Mr. Hill to inform him of the acquisition.

26.

That same day, on the advice of the Wells Fargo broker, Mr. Hill sold all his Radiant stock in all of his brokerage accounts. Mr. Hill's total gain was approximately $744,000.

27.

On or around March 2013, the Division of Enforcement of the SEC ("Division") began an investigation into whether Mr. Hill engaged in insider trading in connection with his purchases of Radiant stock. At all times Mr. Hill has vigorously denied that he was ever in possession of any material, nonpublic

information related to Radiant. However, Mr. Hill has fully cooperated with the Division's every request. He has testified three times and produced every document that the Division has requested. He has never once declined to answer a single question asked by the Division, nor has he refused to produce any of the documents requested by the Division.

28.

Specifically, Mr. Hill has repeatedly and consistently explained in detail to the Division his valid and legitimate reasons for purchasing Radiant stock, including, *inter alia,* his knowledge of their product, his understanding of the value their machines could add based on his experience with the restaurant industry, his knowledge and positive impression of the CEO of the company, his observations regarding the stock's growth patterns despite the global financial crisis, and the circumstances that occurred in his commercial real estate business that caused Mr. Hill to possess $3.6 million in capital that he no longer needed to commit to the projects that he had anticipated using the capital to fund.

29.

Not satisfied with this completely rational and uncontested explanation, the Division continued to try to unearth some evidence to support its purely

speculative theory that Mr. Hill must have had access to inside information on Radiant based merely on the timing and concentration of his purchases.

30.

As part of the Division's nearly two-year investigation, the Division issued several other subpoenas for documents and testimony. The Division interviewed Radiant's CEO and CFO once, Radiant's COO twice, a close friend of Radiant COO, the Artist, two times, and each of Mr. Hill's brokers once. In total, the Division took 12 examinations, issued at least 13 subpoenas for documents and received tens of thousands of documents in response.

31.

The net sum of the Division's two-year investigation produced no direct evidence that Mr. Hill ever received any material nonpublic information prior to any of his purchases of Radiant stock.

32.

Although, Mr. Hill was familiar with Radiant CEO, Radiant COO and Radiant CFO, the Division's investigation did not produce any evidence that any of those individuals provided Mr. Hill with any material nonpublic information. The Division does not dispute this.

33.

Instead, the Division contends, even in the face of a complete absence of any direct evidence to support this theory, that Radiant COO provided material nonpublic information concerning Radiant's acquisition to Artist, who, in turn relayed the material non-public information he learned to Mr. Hill.

34.

Both the Radiant COO and the Artist deny this. The Radiant COO testified to the Division that he did not provide any material non-public information about Radiant to the Artist. Similarly, the Artist testified that he was not in possession of any material non-public information about Radiant and did not provide any material non-public information about Radiant to Mr. Hill.

35.

The Division has not identified any documents or testimony to contradict the Radiant COO's, the Artist's, or Mr. Hill's sworn testimony.

36.

Instead, the Division's speculative theory of insider trading rests on the conclusory allegation that because the Radiant COO and the Artist were close friends who frequently communicated with each other and the Artist and Mr. Hill were also close friends who frequently communicate with each other, that the

Artist must have possessed material non-public information about Radiant's acquisition and shared that information with Mr. Hill.

37.

Although phone records indicate that the Radiant COO and Artist and the Artist and Mr. Hill communicated frequently during the May 2011 through July 2011 period when the Radiant acquisition was being negotiated, the frequency of this communication was completely consistent with the pattern that they had all followed for several years.

38.

Notably, the Division has not asserted any claim against the Radiant COO or the Artist, and apparently does not question their credibility because it intends to rely on their testimony at the final hearing. The SEC did not even send a Wells Notice to the COO. The Artist received a Wells Notice, but following his Wells Submission, he received a termination letter from the SEC.

**THE ADMINISTRATIVE PROCEEDING**

39.

On February 17, 2015, the Commission served Mr. Hill with an Order Instituting Cease-And-Desist Proceedings ("OIP") under Section 21C of the

Securities and Exchange Act of 1934 ("Exchange Act").[6] According to the OIP, the SEC alleges that Mr. Hill is liable for insider trading relating to his trading in Radiant in 2011 in violation of Section 14(e) of the Exchange Act and Rule 14e-3 promulgated thereunder. The Commission seeks a determination of, among other things, whether Mr. Hill should be ordered to pay civil monetary penalties of millions of dollars and disgorgement under Sections 21B(a), 21B(e), and 21C(e) of the Exchange Act.

40.

Before the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act"), the SEC could bring an action against an unregulated individual like Mr. Hill for the above-referenced remedies only in a federal district court, where Mr. Hill would hold a Seventh Amendment right to a jury trial.

41.

But under Section 929P(a) of the Dodd-Frank Act, the SEC now has unguided authority to bring the same action in an administrative Commission proceeding. This unfettered decisionmaking authority has been the centerpiece of the SEC's recent enforcement strategy.

---

[6] *See* Hudson Decl. ¶ 7, Ex. 4.

42.

Following a string of recent losses in federal jury trials, Andrew Ceresney, the Director of the SEC's Division of Enforcement, announced that the SEC planned to bring more of its insider trading cases in its own administrative courts.[7] The SEC's motivation for depriving individuals of their right to a jury trial in federal district court and instead hailing them before its own judges is clear.

For one thing, threatening individuals with an administrative proceeding has compelled settlements. Mr. Ceresney has himself stated that "there have been a number of cases in recent months where we have threatened administrative proceedings, it was something we told the other we were going to do and they settled."[8]

43.

The SEC also enjoys a pronounced home-court advantage. According to a recent Wall Street Journal analysis, the SEC has "won against 90% of defendants before its own judges in contested cases from October 2010 through March of this year."[9] In stark contrast, it has only garnered a 69% success rate in cases litigated

[7] Hudson Decl. ¶ 8, Ex. 5.

[8] Hudson Decl. ¶ 9, Ex. 6.

[9] *See id.* ¶ 10, Ex. 7.

in federal court over the same period.[10] U.S. District Judge, Jed Rakoff, remarked that in fiscal year 2014 alone, the SEC won 100% of its administrative enforcement actions, while its success rate in federal court reached only 61%.[11]

44.

This advantage also extends to appeals of ALJ decisions, which are heard by the SEC's Commissioners. The same Wall Street Journal analysis found that, from January 2010 through this past March, the commissioners found for the SEC in 53 out of 56 appeals (or 95%).[12] These results are hardly surprising. Bradley Bondi, a former counsel to two former commissioners, recently stated that "[i]n an administrative law proceeding[,] the commission is akin to the prosecutor and then, in an appeal, the judge in the same case."[13]

45.

Besides this high success rate, the administrative process may also be set up with the deck stacked against defendants like Mr. Hill. One former SEC ALJ, Lillian McEwen, recently told the Wall Street Journal that she believed the

---

[10] *Id.*

[11] *See id.* ¶ 11, Ex. 8; ¶ 12, Ex. 9.

[12] Hudson Decl. ¶ 10, Ex. 7.

[13] Hudson Decl. ¶ 10, Ex. 7.

administrative review process was at times slanted against defendants.[14] She stated that she retired because her "loyalty to the SEC" was questioned by the agency's Chief Administrative Law Judge after finding in favor of defendants in too many cases.[15] Ms. McEwen also added that the expectation was for SEC judges to work under the assumption that "the burden was on the people who were accused to show that they didn't do what the agency said they did."[16]

46.

Fairness concerns even emanate from the SEC's attorneys and Commissioners themselves. The General Counsel of the Commission, Anne K. Small, specifically acknowledged in a public forum last summer that the current administrative proceeding rules are inadequately tailored to address the complexities raised by an insider trading case.[17] In a question and answer session between Small and members of the District of Columbia Bar, Small stated to ensure that "the process is fair and reasonable," it was "entirely reasonable to wonder" if the administrative proceeding rules should be updated to adequately

---

[14] Hudson Decl. ¶ 10, Ex. 7.

[15] *Id.*

[16] *Id.*

[17] Hudson Decl. ¶ 13, Ex. 10.

address the increasing number of insider trading and other complex cases being brought within the Commission.[18]

47.

More recently, a current Commissioner acknowledged that the SEC's "enforcement program could also benefit from a look through the lens of fairness."[19] Indeed, to "avoid the perception that the Commission is taking its tougher cases to its in-house judges, and to ensure that all are treated fairly and equally," the Commissioner called for the SEC to establish guidelines to determine which enforcement actions should be brought in an administrative forum and which actions should be brought in federal court.[20] Yet, instead of providing the "consistent set of guidelines" advocated by this Commissioner, the recently published "Approach to Forum Selection in Contested Actions" from the SEC's Division of Enforcement[21] "shed[s] little light on how the decision will be made."[22]

---

[18] *Id.*

[19] Hudson Decl. ¶ 12, Ex. 9.

[20] *Id.*

[21] Hudson Decl. ¶ 14, Ex. 11.

[22] *See id.* ¶ 15, Ex. 12.

48.

One consideration contained in the Division of Enforcement's guidance suggests that the SEC desires to exert more control over the development of complex legal questions. Indeed, when a case is "likely to raise unsettled and complex" issues, the guidance states that "consideration should be given to . . . obtaining a Commission decision on such issues, subject to appellate review in the federal courts [to] facilitate development of the law."[23] Before this guidance was issued, a former SEC Commissioner told the Wall Street Journal that in "bringing more cases in its own backyard, the agency is not only increasing its chances of winning but giving itself greater control over the future evolution of legal doctrine."[24] And the SEC's efforts to shape the law are helped by the limited appellate review of Commission interpretations of ambiguous securities law issues, which are entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).

[23] *See* Hudson Decl. ¶ 14, Ex. 11 at 3.

[24] *Id.* ¶ 10, Ex. 7.

49.

The target of this chorus of criticism and concern – the SEC administrative proceeding – lacks the constitutional and procedural safeguards available in a federal district court action.

50.

An administrative proceeding happens within the SEC's confines. It is prosecuted by SEC attorneys, governed by the SEC's Rules of Practice ("Rules of Practice"), and is adjudicated by an SEC ALJ, who serves as the finder of fact and law.

51.

Unlike a civil action in federal district court, a respondent in an administrative proceeding has no right to a trial by jury.

52.

The Federal Rules of Civil Procedure are not applicable in an administrative proceeding.

53.

The Federal Rules of Evidence are also not applicable in an administrative proceeding. Instead, any evidence that "can conceivably throw any light upon the controversy," including hearsay, "normally" will be admitted in an administrative

proceeding. *In the Matter of Jay Alan Ochanpaugh*, Release No. 54363 (Aug. 25, 2006), 88 S.E.C. Docket 2510, 2006 WL 2482466, at *6 n.29.

54.

The discovery allowed in an administrative proceeding is far more limited than in federal court. Indeed, respondents are generally barred from taking depositions under Rules of Practice 233 and 234. Mr. Hill is thus prohibited from taking the equivalent of a Rule 30(b)(6) deposition of the SEC. Respondents may also obtain documents only through the issuance of a Subpoena under Rule of Practice 232.[25]

55.

Administrative proceedings run on a much faster timetable than civil cases in federal court. Under Rule of Practice 360, an evidentiary hearing must occur, at most, approximately four months after the SEC issues an OIP. The SEC even has the discretion to require that the hearing occur as early as one month after the OIP's issuance. And the SEC need not begin making available the limited discovery afforded to respondents in an administrative proceeding until seven days

[25] Significantly, while Mr. Hill has sought the issuance of a subpoena to the SEC for the production of documents relevant to the administrative proceeding, the Division of Enforcement has already signaled that they will move to quash the subpoena.

after the OIP's issuance. At bottom, although the SEC enjoyed the benefit of having two years to conduct its investigation of this complex case, Mr. Hill is required to digest the investigative file and prepare for trial in a mere four months.

56.

Although a defendant in a federal civil action may assert counterclaims, the Rules of Practice bar a respondent from doing so in an administrative proceeding.

57.

Nor do the Rules of Practice allow a respondent to file the equivalent of a Rule 12 motion to dismiss to test the legal sufficiency of the allegations underlying the SEC's administrative complaint.

58.

An appeal from the SEC ALJ's decision is heard by the SEC itself: the very body that approved the administrative enforcement action in the first place. The Commission has the authority to hear or decline an appeal and to even impose greater sanctions than those ordered by the ALJ. Only after it becomes effective, may a Commission's final order be then appealed to a United States Court of Appeals. Of course, by that point, the unconstitutional administrative proceeding will have already come to an end.

**CONGRESS' DELEGATION OF POWER TO THE SEC TO BRING ADMINISTRATIVE CIVIL PENALTY ENFORCEMENT ACTIONS AGAINST UNREGULATED INDIVIDUALS VIOLATES ARTICLE I**

59.

Article I, § 1 of the U.S. Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." U.S. Const. art. I, § 1. As such, the Supreme Court has long insisted that "'the integrity and maintenance of our system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)). Despite this general prohibition, Congress may confer decisionmaking authority on an executive agency, so long as it provides an intelligible principle to which that agency is to conform. *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001).

60.

The Dodd-Frank Act's conferral of administrative enforcement authority to the Commission to seek civil penalties against unregulated individuals constitutes a delegation of legislative power because the SEC now possesses expanded authority to alter the rights, duties, and legal relations of individuals. *See I.N.S. v. Chadha*, 462 U.S. 919, 952 (1983); *see also Metro. Wash. Airports Auth. v. Citizens for*

*Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985).

61.

Before the enactment of the Dodd-Frank Act, enforcement actions against unregulated individuals for civil penalties had to be brought exclusively in an Article III court.[26] However, by virtue of the Dodd-Frank Act, the Commission now also possesses the authority to bring this action in an administrative proceeding that lacks the same procedural safeguards, such as the Seventh Amendment right to a jury trial, that are found in its Article III counterpart. *See* Pub. L. No. 111-203 §§ 929P(a)(1), (a)(2)(E), (a)(3)(e), and (a)(4)(e) (allowing the Commission to seek civil penalties against "any person" in an administrative cease-and-desist proceeding initiated under the Securities Act, the Exchange Act, the Company Act, and the Investors Act).

62.

Despite the broad scope of power delegated to the Commission, the Dodd-Frank Act lacks any "intelligible principle" as to when an enforcement action for

---

[26] *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub L. 101-429 (1990) §§ 101, 201, 302, 402 (authorizing the Commission to bring suit against "any person" in a federal district court to seek civil penalties); *see also* 15 U.S.C. § 78u-1 (authorizing the Commission to bring an action in federal district court to seek civil penalties for insider trading).

civil penalties against an unregulated individual should be brought in an administrative, rather than a judicial, forum. *See* Pub. L. No. 111-203 §§ 929P(a)(1), (a)(2)(E), (a)(3)(e), and (a)(4)(e). The relevant legislative history is also silent on this matter. *See* H.R. Rep. No. 111-517, at 870-71 (2010) (Conf. Rep.); H.R. Rep. No. 111-687, pt. 1, at 78 (2010).

63.

Even the Commission's attorneys and Commissioners have admitted the lack of *any* congressional principal guiding the Commission's selection of a forum in which to bring an enforcement action. When previously asked by a court to articulate "the criteria that the SEC uses to determine whether a matter is referred to court, criminally or civilly, versus referred for administrative proceeding," a Commission attorney responded:

> To start with, Congress gave the SEC two distinct paths that it can follow in pursuing a civil action: You can go into Federal District Court; you can bring it in an administrative proceeding. *It did not provide any criteria as to when the Commission would or should do one versus the other.* It's entirely left to the Commission's discretion. The Commission decides – does not have formal criteria.
>
> The Commission decides on a case-by-case basis, based on everything before it, which route it might want to follow.

Tr. of Mot. for TRO at 66-67, *Jarkesy v. United States Sec. and Exchange Comm'n*, No. 1:14-cv-00114-BAH (D.D.C. June 11, 2014) (No. 22) (emphasis added).[27]

64.

And in light of the vacuum created by Congress, a Commissioner recently acknowledged the need to establish guidelines as to when enforcement actions should be brought in an administrative, as opposed to, a judicial forum. *See* para 47. Although the Division of Enforcement has since issued this guidance, the considerations contained therein offer little clarity as to how the SEC goes about selecting the forum in which to bring an enforcement action.

65.

The admitted absence of a guiding principle from Congress renders the Dodd-Frank Act's delegation of expanded administrative enforcement authority unconstitutional as a violation of Article I.

---

[27] *See* Hudson Decl. ¶ 16, Ex. 13.

**THE CONFERRAL OF UNLIMITED AUTHORITY TO THE SEC TO BRING ADMINISTRATIVE CIVIL PENALTY PROCEEDINGS VIOLATES THE SEVENTH AMENDMENT OF THE CONSTITUTION**

66.

The Seventh Amendment states that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const., amend. VII.

67.

The Supreme Court has "consistently interpreted the phrase 'suits at common law' to refer to suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (internal quotation marks and citations omitted). The Seventh Amendment also extends to "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Id.* at 42.

68.

An administrative civil penalty enforcement action is analogous to the 18th century common law cause of action in debt, "and federal courts have rightly

assumed that the Seventh Amendment required a jury trial." *Tull v. United States*, 481 U.S. 412, 420 (1987).

69.

Civil penalties intended to punish culpable individuals, like those sought by the SEC here, is a type of "remedy at common law that could only be enforced in courts of law." The Seventh Amendment thus attaches to this type of proceeding. *Tull*, 481 U.S. at 422-23.

70.

Even if this enforcement action involved a public right created by Congress, *see Atlas Roofing Co. v. Occupational Safety and Health Comm'n*, 430 U.S. 442, 452 (1977), until 2010, Congress had exclusively assigned the adjudication of such rights to an Article III court, in which a jury trial right attached.

71.

When enacted in 2010, the Dodd-Frank Act did not *create a new* public right. Indeed, it created neither a new cause of action nor remedies therefor. *See Granfinanciera, S.A.*, 492 U.S. at 60. Instead, the Dodd-Frank Act simply authorized the Commission to institute a preexisting type of government enforcement action that was once the exclusive province of an Article III court in an administrative forum as well.

72.

Thus, without creating any new public rights, Congress has eliminated the exclusivity of the judicial forum where civil penalty enforcement actions against unregulated individuals like Mr. Hill were adjudicated subject to constitutional safeguards, such as the Seventh Amendment right to a jury trial. The Dodd-Frank Act now places an unregulated individual's once guaranteed right to a jury trial in the unprincipled hands of the Commission. Yet, a party's Seventh Amendment right cannot be altered in this fashion. *Cf. Granfinanciera, S.A.*, 492 U.S. at 60-61.

73.

Because the Dodd-Frank Act did not create a new public right, Congress contravened the Seventh Amendment when it authorized the Commission to bring civil penalty enforcement actions against unregulated individuals in an administrative forum.

**THE ADMINISTRATIVE PROCEEDING VIOLATES ARTICLE II BECAUSE THE PRESIDING ALJ IS PROTECTED FROM REMOVAL BY TWO LAYERS OF GOOD-CAUSE TENURE PROTECTION**

74.

Article II of the Constitution vests the executive power in the President, who must "take Care that the Laws be faithfully executed." U.S. Const. art. II § 1, cl. 1; *id.* § 3. In discharging this duty, the Constitution authorizes the President to rely

on the assistance of executive officers. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) ("*Free Enterprise*").

75.

SEC ALJs are inferior executive officers because they are appointees who exercise "significant authority pursuant to the laws of the United States." *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991). Indeed, an SEC ALJ's duties, salary, and means of appointment are all set forth by statute. The Exchange Act and SEC regulations similarly set forth an ALJ's broad authority to conduct administrative proceedings instituted by the Commission. Instead of performing mere ministerial tasks, SEC ALJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag*, 501 U.S. at 881-82.

76.

SEC ALJs are also shielded from removal by two layers of good-cause tenure protection. First, an SEC ALJ may be removed by the Commission only upon a finding of good-cause by the Merit Systems Protection Board ("MSPB").[28] 5 U.S.C. § 7521(a)-(b). Second, SEC Commissioners and members of the MSPB

[28] An MSPB decision to remove an ALJ is subject to judicial review. 5 U.S.C. § 7703.

can be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." *Free Enterprise*, 561 U.S. at 487; 5 U.S.C. § 1202(d). This multi-layer good-cause protection is analogous to the tenure structure that was held to violate Article II in *Free Enterprise*. Indeed, like its counterpart in *Free Enterprise*, this removal scheme impairs the President's ability to ensure that the laws are faithfully executed. *Free Enterprise*, 561 U.S. at 498.

77.

Because the dual-layer removal scheme prevents the President from exercising any oversight over SEC ALJs, it unduly infringes the constitutional separation of powers.

**ABSENT THIS COURT'S INTERVENTION, MR. HILL WILL SUFFER SEVERE AND IRREPARABLE HARM**

78.

By virtue of the SEC ALJ's ruling on Mr. Hill's motion for summary disposition, Mr. Hill will be deprived of the opportunity to have core constitutional defenses challenging the existence of the administrative proceeding heard during the final hearing, which will take place on June 15, 2015.

79.

And absent this Court's intervention, Mr. Hill will be further subjected to the very proceeding that he claims is unconstitutional. The lack of traditional procedural safeguards in the administrative proceeding only exacerbates that harm.

80.

Should Mr. Hill fail to prevail in the administrative proceeding, the damage could be severe and irreversible. By the time Mr. Hill were to seek review of a final adverse Commission decision in a Court of Appeals, it will be too late to unwind the substantial expense, burden, and reputational harm that he will have already suffered in being compelled to participate in the administrative proceeding. Any sanctions imposed could also damage Mr. Hill well before he could obtain judicial review of his constitutional challenges.

81.

Mr. Hill's participation in this unconstitutional proceeding cannot be redressed through legal relief either because the Commission is shielded from a suit for money damages by sovereign immunity doctrines. Under Eleventh Circuit precedent, irreparable harm exists when a plaintiff has no monetary recourse on account of sovereign immunity. Even if money damages were available, the

reputational harm Mr. Hill would suffer should the SEC impose administrative sanctions would likely be impossible to monetize.

82.

The threatened injury to Mr. Hill outweighs any harm the Commission may suffer as a result of the temporary halting of the civil penalty administrative enforcement proceeding. The SEC has already spent nearly two years investigating Mr. Hill for alleged securities violations. Thus, the SEC cannot reasonably contend that it will be harmed by a pause in the administrative proceeding pending resolution of Mr. Hill's constitutional claims. Indeed, any harm befalling the SEC could be immediately remedied by the SEC through the commencement of a proceeding against Mr. Hill in federal court.

**COUNT ONE**
**APPLICATION FOR INJUNCTIVE RELIEF**

83.

Mr. Hill re-alleges and incorporates paragraphs 1- 82 above, as if fully set forth herein.

84.

Mr. Hill's constitutional rights will be irreparably harmed if a permanent injunction (and, if necessary, a preliminary injunction and temporary restraining order) are not issued against the SEC's administrative proceeding. Mr. Hill has a

substantial likelihood of success on the merits of his claim. Mr. Hill will be irreparably injured without injunctive relief, as described above, and the harm to him, absent injunctive relief, far outweighs any harm to the SEC should the requested relief be granted. Finally, issuing an injunction will serve the public interest in ensuring that administrative enforcement schemes operate within constitutional boundaries.

**COUNT TWO**
**DECLARATORY JUDGEMENT**

85.

Mr. Hill re-alleges and incorporates paragraphs 1-84 above, as if fully set forth herein.

86.

Mr. respectfully requests a declaratory judgment that: (i) the statutory provisions authorizing the SEC to bring administrative civil penalty enforcement actions against unregulated individuals are unconstitutional; and (ii) the statutory and regulatory provisions providing for the position and tenure protections of SEC ALJs are unconstitutional.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

(a) An order and judgment declaring unconstitutional the statutory provisions authorizing the SEC to bring administrative civil penalty enforcement actions against unregulated individuals;

(b) An order and judgment declaring unconstitutional the statutory and regulatory provisions providing for the position and tenure protection of the SEC ALJ;

(c) An order and judgment enjoining the Commission from pursuing an administrative proceeding against Mr. Hill; and

(d) Such other and further relief as this Court may deem just and proper, including reasonable attorney's fees and the costs of this action.

Respectfully submitted, May 19, 2015.

s/ Stephen E. Hudson
Stephen E. Hudson
Georgia Bar No. 374692
Hillary D. Rightler
Georgia Bar No. 572475
Akash R. Desai
Georgia Bar No. 338124

Attorneys for Plaintiff

KILPATRICK TOWNSEND &
STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
shudson@kilpatricktownsend.com
hrightler@kilpatricktownsend.com
adesai@kilpatricktownsend.com